Opinion
BROWN, J.
The question presented by this case is whether state law claims for failure to warn of the risks of using a pesticide are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 U.S.C. § 136 et seq.).
Unlike the Court of Appeal here, the overwhelming majority of the courts that have considered this question, including eight of the federal circuit courts of appeals, have concluded that state law failure-to-warn claims are preempted by FIFRA. (See, e.g., Grenier v. Vermont Log Bldgs., Inc. (1st Cir. 1996) 96 F.3d 559; King v. E.I. Dupont De Nemours and Co. (1st Cir. 1993) 996 F.2d 1346, cert. dism. (1993) 510 U.S. 985 [114 S.Ct. 490, 126 L.Ed.2d 440]; Worm v. American Cyanamid Co. (4th Cir. 1993) 5 F.3d 744; MacDonald v. Monsanto Co. (5th Cir. 1994) 27 F.3d 1021; Kuiper v. American Cyanamid Co. (7th Cir. 1997) 131 F.3d 656, cert. den. (1998) 523 U.S. 1137 [118 S.Ct. 1839, 140 L.Ed.2d 1090]; Shaw v. Dow Brands, Inc. (7th Cir. 1993) 994 F.2d 364; Bice v. Leslie's Poolmart, Inc. (8th Cir. 1994) 39 F.3d 887; Taylor AG Industries v. Pure-Gro (9th Cir. 1995) 54 F.3d 555; Arkansas-Platte & Gulf v. Van Waters & Rogers (10th Cir. 1993) 981 F.2d 1177, cert. den. (1993) 510 U.S. 813 [114 S.Ct. 61, 126 L.Ed.2d 31]; Papas v. Upjohn Co. (11th Cir. 1993) 985 F.2d 516, cert. den. (1993) 510 U.S. 913 [114 S.Ct. 300, 126 L.Ed.2d 248]; accord, Louisiana-Pacific Corp. v. Koppers Co. (1995) 32 Cal.App.4th 599 [38 Cal.Rptr.2d 257]; contra, Ferebee v. Chevron Chemical Co. (D.C. Cir. 1984) 736 F.2d 1529 [237 App.D.C. 164].)
While we are not bound by decisions of the lower federal courts, even on federal questions, they are persuasive and entitled to great weight. (People v. Bradley (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].) *321 Where lower federal precedents are divided or lacking, state courts must necessarily make an independent determination of federal law (Rohr Aircraft Corp. v. County of San Diego (1959) 51 Cal.2d 759, 764 [336 P.2d 521], revd. without comment on this point (1960) 362 U.S. 628 [80 S.Ct. 1050, 4 L.Ed.2d 1002]), but where the decisions of the lower federal courts on a federal question are “both numerous and consistent,” we should hesitate to reject their authority (Conrad v. Bank of America (1996) 45 Cal.App.4th 133, 150 [53 Cal.Rptr.2d 336]).
The federal court decisions holding that FIFRA preempts state law failure-to-warn claims are numerous, consistent, pragmatic and powerfully reasoned. As discussed below, we find their analysis persuasive and reverse the judgment of the Court of Appeal reaching the contrary conclusion.
Factual and Procedural Background
Under FIFRA, all pesticides sold in the United States must be registered with the United States Environmental Protection Agency (EPA). (7 U.S.C. § 136a(a).[1] In the registration application, manufacturers must submit draft label language addressing a number of different topics, including ingredients, directions for use (40 C.F.R. § 152.50 (1999)), and any information of which they are aware regarding “unreasonable adverse effects of the pesticide on man or the environment.” (40 C.F.R. § 152.50(f)(3).) Prior to registering a pesticide, the EPA must find that its labeling complies with FIFRA’s requirements. (§ 136a(c)(5)(B).) This includes the EPA’s determination that the pesticide is not “misbranded.” (See 40 C.F.R. § 152.112(f).) A pesticide is misbranded if, inter alia, its label “does not contain a warning or caution statement which may be necessary and ... is adequate to protect health and the environment.” (§ 136(q)(G).) In addition, the EPA must find that the pesticide, when used in accordance with its labeling, “will perform its intended function without unreasonable adverse effects on the environment.” (§ 136a(c)(5)(C).) “Unreasonable adverse effects on the environment” are defined as “any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide.” (§ 136(bb).) Finally, FIFRA provides that a state “shall not impose or continue in effect any requirements for labeling ... in addition to or different from those required under this subchapter.” (§ 136v(b).)
Defendant Bayer Corporation (Bayer) manufactures the pesticides Guthion and Morestan, the labels of which were approved by the EPA. The label for Guthion states that application to walnuts to kill codling moths and *322 other insects is a recommended use, with the recommended amount being three to four pounds per acre as a full-coverage spray. The label for Morestan states that application to walnuts to kill aphids and mites is a recommended use, with the recommended amount being one to one and one-half pounds per 100 gallons of water as a full-coverage spray.
Plaintiffs operate walnut orchards and purchased Guthion and Morestan from defendant Tri-Ag Service, Inc. (Tri-Ag). Defendant Paul Osterlie, a pest control adviser licensed in' California and a Tri-Ag employee, recommended a combined application of Guthion and Morestan at three pounds each per treated acre, along with other materials, and water delivered in an aggregate of 125 gallons of material per acre. Plaintiffs followed Osterlie’s recommendations and applied the combination of Guthion and Morestan to three orchards, resulting in approximately $150,000 damage to their walnut crop.
Plaintiffs sued Tri-Ag, Osterlie, and Bayer for negligence, strict liability for ultrahazardous activity, negligence per se, products liability, breach of implied warranty, misrepresentation, and trespass. Defendants moved for summary judgment on the ground that all of the causes of action, in effect, challenged the adequacy of the warnings on Guthion’s and Morestan’s EPA-approved labels, and thus were preempted by FIFRA. In two summary judgment rulings, the trial court agreed, holding that all of plaintiffs’ causes of action “allege inadequate labeling in one form or another,” with the “main issue being the failure of the labels to warn against mixing chemicals.” In addition, the court held plaintiffs failed to produce evidence indicating a cause of action for negligence against defendants Tri-Ag and Osterlie, and, as to the cause of action for misrepresentation, failed to raise a triable issue of fact as to intent to defraud on the part of defendants. The Court of Appeal reversed.
Discussion
Recognizing that the overwhelming majority of the courts examining the question have concluded FIFRA preempts state law failure-to-warn claims, the Court of Appeal asked itself how “the bulk of the case law [had] gone astray.” There were two answers, the court found. One was the perceived failure of the other courts to draw the correct lesson from Cipollone v. Liggett Group, Inc. (1992) 505 U.S. 504 [112 S.Ct. 2608, 120 L.Ed.2d 407] (Cipollone), in which the Supreme Court held the Public Health Cigarette Smoking Act of 1969 preempted state law failure-to-warn actions. Specifically, the Court of Appeal argued, “the case law goes wrong in failing to consider, as the proper analogy, the preemption provision of the Cigarette *323 Labeling and Advertising Act of 1965,” which the high court held does not bar common law actions. The second was the failure of the other courts “to consider adequately” the text of the FIFRA preemption provision (§ 136v(b)) in light of the rest of the statute, particularly subdivision (a) of section 136v. The one case that got it right, in the view of the Court of Appeal, was Ferebee v. Chevron Chemical Co., supra, 736 F.2d 1529 (Ferebee).

A. Cipollone, the Preemption Provisions of the 1965 and 1969 Cigarette Acts, and the Lessons to Be Drawn for FIFRA

In Cipollone, supra, 505 U.S. 504, the plaintiff, a woman who ultimately died of lung cancer after years of smoking, sued cigarette manufacturers under state common law for failure to warn consumers of the dangers of smoking. The manufacturers argued state law failure-to-warn actions were preempted by the Federal Cigarette Labeling and Advertising Act of 1965 (Pub.L. No. 89-92 (July 27, 1965) 79 Stat. 282, codified at 15 U.S.C. § 1331 et seq.) (the 1965 Cigarette Act) and its successor, the Public Health Cigarette Smoking Act of 1969 (Pub.L. No. 91-222 (Apr. 1, 1970) 84 Stat. 87, amending 15 U.S.C. § 1331 et seq.) (the 1969 Cigarette Act). The Supreme Court held the 1965 Cigarette Act did not bar common law claims, but the 1969 act does. (Cipollone, supra, 505 U.S. at pp. 524-525, 530-531 [112 S.Ct. at pp. 2622, 2625.)[2]
The preemptive scope of the two acts, the high court held, was “governed entirely by the express language in § 5 of each Act.” (Cipollone, supra, 505 U.S. at p. 517 [112 S.Ct. at p. 2618].)
Section 5 of the 1965 Cigarette Act provided in part: “(a) No statement relating to smoking and health, other than the statement required by section 4 of this Act, shall be required on any cigarette package, [¶] (b) No statement *324 relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.” (Pub.L. No. 89-92, § 5 (July 27, 1965) 79 Stat. 282.)
By contrast, section 5 of the 1969 Cigarette Act provides: “(b) .No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.” (Pub.L. No. 91-222, § 5 (Apr. 1, 1970) 84 Stat. 88.)
As the high court observed, in the preemption provision of the 1965 Cigarette Act, Congress “spoke precisely and narrowly,” merely prohibiting state and federal rulemaking bodies from mandating particular cautionary statements on cigarette labels or in cigarette advertisements. (Cipollone, supra, 505 U.S. at p. 518 [112 S.Ct. at p. 2618].)
Compared to its predecessor in the 1965 Cigarette Act, the plain language of the preemption provision of the 1969 Cigarette Act, the high court held, is “much broader,” barring “not simply ‘statement[s] ’ but rather ‘requirements] or prohibition[s] . . . imposed under State law.’ ” (Cipollone, supra, 505 U.S. at p. 520 [112 S.Ct. at p. 2619].) “The phrase ‘[n]o requirement or prohibition’ sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules. As we noted in another context, ‘[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.’” (Id. at p. 521 [112 S.Ct. at p. 2620], quoting San Diego Building Trades Council v. Garmon (1959) 359 U.S. 236, 247 [79 S.Ct. 773, 780, 3 L.Ed.2d 775].)
Like the preemption provision of the 1969 Cigarette Act, section 136v(b) of FIFRA provides that a state “shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.” (Italics added.)
“There is no notable difference between the language in the 1969 Cigarette Act and the language in FIFRA.” (Taylor AG Industries v. Pure-Gro, supra, 54 F.3d at p. 559.) “For this reason,” the Ninth Circuit Court of Appeals noted, “seven circuits have held that § 136v(b) preempts failure to warn claims based on inadequate labeling. See Bice v. Leslie's Poolmart, Inc., 39 F.3d 887, 888 (8th Cir.1994); MacDonald v. Monsanto Co., 27 F.3d 1021, 1024-25 (5th Cir.1994); Worm v. American Cyanamid Co., 5 F.3d 744, 747 *325 (4th Cir. 1993) . . . ; King, 996 F.2d at 1349; Shaw, 994 F.2d at 371; Papas v. Upjohn Co., 985 F.2d 516, 518 (11th Cir.) . . . ; Arkansas-Platte & Gulf Partnership v. Van Waters & Rogers, Inc., 981 F.2d 1177, 1179 (10th Cir.) . . . .” (54 F.3d at p. 560.)
“We believe ... the prohibition of ‘any’ requirement is the functional equivalent of ‘no’ requirement. We see no difference between the operative effect of the two acts.” (Arkansas-Platte & Gulf v. Van Waters & Rogers, supra, 981 F.2d at p. 1179 [10th Cir. 1993].)
“The FIFRA language prohibiting the states from ‘imposing] or continuing] in effect any requirements,’ 7 U.S.C. § 136v(b), is virtually indistinguishable from the state-imposed ‘requirement’ language that Cipollone held preempted the state common law tort claims based on inadequate warning. FIFRA’s language, too, preempts the state law lack-of-warning claims involved in this case.” (King v. E.I. Dupont De Nemours and Co., supra, 996 F.2d at p. 1349 [1st Cir. 1993].)
“In order to succeed in the wake of Cipollone, then, Shaw would have to show that FIFRA’s pre-emption language is less sweeping than the language of the 1969 Cigarette Act. Yet we can discern no significant distinction at all—FIFRA says that ‘[s]uch State shall not impose . . . any requirements for labeling or packaging in addition to or different from those required . . . ,’ while the cigarette law says ‘[n]o requirement[s] or prohibition[s] . . . imposed under State law’ shall be permitted. Both seem equally emphatic: ‘[n]o requirements or prohibitions’ is just another way of saying a ‘[s]tate shall not impose . . . any requirements.’ Not even the most dedicated hair splitter could distinguish these statements. If common law actions cannot survive under the 1969 cigarette law, then common law actions for labeling and packaging defects cannot survive under FIFRA.” (Shaw v. Dow Brands, Inc., supra, 994 F.2d at p. 371 [7th Cir. 1993].)
The Court of Appeal acknowledged the weight of authority, but found the analysis flawed. “A striking omission in the post-Cipollone FIFRA preemption case law is the lack of any comparison of the FIFRA preemption provision and the preemption provision, in the 1965 Act.” We disagree. Cipollone emphasized that “the pre-emptive scope of the 1965 Act and the 1969 Act is.governed entirely by the express language in § 5 of each Act.” (505 U.S. at p. 517 [112 S.Ct. at p. 2618].) The circuit courts analyzed the FIFRA preemption provision in light of Cipollone. Indeed, two of them were expressly remanded in light of Cipollone. (Papas v. Upjohn Co., supra, 985 F.2d 516; Arkansas-Platte & Gulf v. Van Waters & Rogers, Inc., supra, 981 F.2d 1177.) In holding that FIFRA was functionally equivalent to the 1969 *326 Cigarette Act, insofar as their preemption provisions were concerned, they impliedly found that it was distinguishable from the 1965 Cigarette Act.
In an attempt to show that section 136v(b) of FIFRA “is more grammatically akin” to the 1965 Cigarette Act preemption provision, the Court of Appeal “substitute[d]” the “core” of the 1965 and 1969 Cigarette Acts’ preemption provisions “into the format” of section 136v(b), thereby literally rewriting the text of section 136v(b). Furthermore, the “substitution of ‘requirements’ for ‘required’ ” to demonstrate that the 1965 Cigarette Act provision is a cognate of section 136v(b) is inconsistent with the Supreme Court’s own comparison of the 1965 and 1969 provisions. As we have noted above, the Supreme Court explained that the 1965 Cigarette Act “bars . . . simply ‘statements’ ” whereas the 1969 Cigarette Act’s provision is “much broader” and bars “ ‘requirement[s] . . . imposed under State law.’ ” (Cipollone, supra, 505 U.S. at p. 520 [112 S.Ct. at p. 2619], italics added.) Thus, the Supreme Court drew the very distinction between the 1965 and 1969 Cigarette Acts that the Court of Appeal seeks to explain away in its effort to prove that all of the other courts are guilty of a “striking omission.”
B. Ferebee and Subdivision (a) of Section 136v
As previously mentioned, the one case that got it right, in the view of the Court of Appeal, was a pr&-Cipollone case—Ferebee, supra, 736 F.2d 1529. The gist of the argument made in Ferebee was that a state’s freedom under section 136v(a) to ban a pesticide outright presupposes the freedom to control the use of that pesticide by imposing tort liability on the manufacturer “for injuries that could have been prevented by a more adequate label.” (736 F.2d at p. 1541.)
“While FIFRA does not allow states directly to impose additional label-ling requirements, the Act clearly allows states to impose more stringent constraints on the use of EPA-approved pesticides than those imposed by the EPA: ‘A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.’ 7 U.S.C. § 136v(a); See also Sen.Rep. No. 838 92d Cong., 2d Sess. 30 (1982) [sic: 1972] reprinted in 1972 U.S.Code Cong. & Admin.News 4021 (‘Generally, the intent of the provision is to leave to the States the authority to impose stricter regulation on pesticides uses than that required under the Act.’) [citations]. Given this provision, Maryland might well have the power to ban paraquat entirely. We need not decide that issue, however, to hold that, if a state chooses to restrict pesticide use by requiring that the manufacturer compensate for all injuries or for some of these injuries resulting from use of *327 a pesticide, federal law stands as no barrier.” (Ferebee, supra, 736 F.2d at p. .1541.)
Reliance upon Ferebee is misplaced because it is no longer good law. (See, e.g., Louisiana-Pacific Corp. v. Koppers Co., supra, 32 Cal.App.4th at p. 608 [explaining that Ferebee “predates Cipollone and ... is no longer good law”]; Shaw v. Dow Brands, Inc., supra, 994 F.2d at p. 370 [concluding that Ferebee’s theory that damages do not impose “requirements” within the meaning of section 136v(b) “evaporated” when the Supreme Court decided Cipollone].) Although the District of Columbia Circuit has not expressly overruled Ferebee, it has expressly acknowledged that Cipollone repudiated its central premise by “explaining that damage actions can be used to enforce state regulations as effectively as other forms of preventive relief and thus damage actions must be preempted where positive enactments are preempted . . . .” (Waterview Management Co. v. F.D.I.C. (D.C. Cir. 1997) 105 F.3d 696, 699 [323 App.D.C. 82] [summarizing Cipollone’s holding].)
Ferebee’s fundamental thesis—that liability under state law for failure to warn is not a requirement for labeling or packaging different from that required under FIFRA—has been rejected by the federal courts since Cipollone as “sophistry” and “silly,” and the attempted distinction has been characterized as “illusory.”
“The MacDonalds argue . . . that state common law tort judgments are not ‘requirements’: the liable party is not ‘required’ to change his label by a damage award, the argument goes, but may simply pay the judgment and leave the label as it is. We think this argument is sophistry. If plaintiffs could recover large damage awards because the herbicide was improperly labeled under state law, the undeniable practical effect would be that state law requires additional labeling standards not mandated by FIFRA.” (MacDonald v. Monsanto Co., supra, 27 F.3d at p. 1025.)
“Shaw’s argument is appealing because, unlike federal regulations which firms are required to follow, common law duties may be simply ignored by defendants. ... On the other hand, damages actions, just like regulatory mandates, cause companies to modify their economic decisions. It would be silly to pretend that federal lawmakers, seeking to occupy a whole field of regulation, wouldn’t also be concerned about the distorting effects of tort actions.” (Shaw v. Dow Brands, Inc., supra, 994 F.2d at p. 370.)
“The Worms’ argument that their state law claims are based on duties not inconsistent with those imposed by FIFRA has no merit. Because the language on the label was determined by the EPA to comply with the federal *328 standards, to argue that the warnings on the label are inadequate is to seek to hold the label to a standard different from the federal one. Nor does it make any difference that the standard the Worms seek to apply is one imposed by the common law rather than by positive legislative or executive enactment. Any distinction between the two is ‘illusory.’ ” (Worm v. American Cyanamid Co., supra, 5 F.3d at p. 748.)
When Congress intends to preempt state regulatory authority but to leave common law actions intact, it knows how to accomplish that. An example is found in the Comprehensive Smokeless Tobacco Health Education Act of 1986, 15 United States Code section 4401 et seq. Section 4406(b) of title 15 of the United States Code preempts “any State or local statute or regulation” regarding labeling or advertising, except billboards, while section 4406(c) provides that “[n]othing in this chapter shall relieve any person from liability at common law or under State statutory law to any other person.”
Furthermore, the United States Supreme Court recently reaffirmed the fundamental principle that savings clauses generally should not be interpreted in such a way as to undercut or dilute an express preemption clause. “ ‘Th[e savings] clause . . . cannot in reason be construed as continuing in [customers] a common law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself. ’ ” (American Telephone & Telegraph Co. v. Central Office Telephone, Inc. (1998) 524 U.S. 214, 227-228 [118 S.Ct. 1956, 1965, 141 L.Ed.2d 222], quoting Texas & Pacific R. Co. v. Abilene Cotton Oil Co. (1907) 204 U.S. 426, 446 [27 S.Ct. 350, 358, 51 L.Ed. 553], italics added.)
C. Medtronic, Inc. v. Lohr (1996) 518 U.S. 470
Although the Court of Appeal does not mention Medtronic, Inc. v. Lohr (1996) 518 U.S. 470 [116 S.Ct. 2240, 135 L.Ed.2d 700] (Medtronic), plaintiffs contend that under its reasoning “common law tort claims involving a ‘failure to warn’ of the dangers of a pesticide are no longer preempted at all.”
Medtronic does not undermine the conclusion that FIFRA preempts state law failure-to-warn claims. The overwhelming majority of the courts that have examined the question have so held. (See Grenier v. Vermont Log Bldgs., Inc., supra, 96 F.3d 559; Oliver v. Reckitt & Colman, Inc. (M.D.Fla. 1998) 12 F.Supp.2d 1287; Hawkins v. Leslie's Poolmart (D.N.J. 1997) 965 F.Supp 566; Kuiperv. American Cyanamid Co. (E.D.Wis. 1997) 960 F.Supp. 1378; Koch v. Shell Oil Co. (D.Kan. 1997) 173 F.R.D. 288; Ackerman v. *329 American Cyanamid Co. (Iowa 1998) 586 N.W.2d 208; Ackles v. Luttrell (1997) 252 Neb. 273 [561 N.W.2d 573], cert. den. (1997) 522 U.S. 928 [118 S.Ct. 329, 139 L.Ed.2d 255]; Didier v. Drexel Chemical Co. (1997) 86 Wash.App. 795 [938 P.2d 364]; Lewis v. American Cyanamid Co. (1998) 155 N.J. 544 [715 A.2d 967]; Sherman v. Claire Manufacturing Co. (1997) 239 A.D.2d 487 [657 N.Y.S.2d 453]; Lescs v. William R. Hughes, Inc. (4th Cir. Jan. 14, 1999, No. 97-2278) 1999 WL 12913.)
In Medtronic, supra, 518 U.S. 470, the high court construed the preemption provision of the Medical Device Amendments of 1976 (MDA). (21 U.S.C. § 360k(a).) Section 360k(a) of title 21 of the United States Code provides that “no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement— [¶] (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and [¶] (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.”
The manufacturer argued, in essence, that “the plain language of the statute pre-empts any and all common law claims brought by an injured plaintiff against a manufacturer of medical devices.” (Medtronic, supra, 518 U.S. at p. 486 [116 S.Ct. at p. 2251].) Rejecting this “sweeping” interpretation of the statute, the plurality opinion held that “§ 360(k) simply was not intended to pre-empt most, let alone all, general common law duties enforced by damages actions.” (518 U.S. at p. 491 [116 S.Ct. at p. 2253].)
Medtronic is distinguishable on the ground Congress gave the federal Food and Drug Administration (FDA) a unique role in determining the scope of preemption under the MDA. “Unlike the statute construed in Cipollone, for instance, pre-emption under the MDA does not arise directly as a result of the enactment of the statute; rather, in most cases a state law will be pre-empted only to the extent that the FDA has promulgated a relevant federal ‘requirement.’ . . . Congress explicitly delegated to the FDA the authority to exempt state regulations from the pre-emptive effect of the MDA—an authority that necessarily requires the FDA to assess the preemptive effect that the Act and its own regulations will have on state laws. . . . The ambiguity in the statute—and the congressional grant of authority to the agency on the matter contained within it—provide a ‘sound basis,’ ... for giving substantial weight to the agency’s view of the statute. . . . [¶] The regulations promulgated by the FDA expressly support the conclusion that § 360k ‘does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act.’” (Medtronic, supra, 518 U.S. at pp. 496-497 [116 S.Ct. at pp. *330 2255-2256] (plur. opn. of Stevens, J.); see also id. at p. 506 [116 S.Ct. at p. 2260] (conc. opn. of Breyer, J.) [emphasizing the FDA’s exercise of “its explicitly designated power to exempt state requirements from pre-emption”].)
Congress did not give the EPA an analogous role in implementing FIFRA. (See Oliver v. Reckitt & Colman, Inc., supra, 12 F.Supp.2d at p. 1291 [“the Court’s decision in Medtronic was influenced by the authority given to the FDA, an authority not given to the EPA”]; Kuiper v. American Cyanamid Co., supra, 960 F.Supp. at p. 1384 [“FIFRA does not have a corresponding federal regulation which limits its preemptive effect .... Such a regulation, along with the MDA’s particular statutory language, was critical to the Court’s opinion in Medtronic”].)
D. The EPA’s Waiver of Submission of Efficacy Data in Registering Pesticides
After we granted review, the United States filed an amicus curiae brief on behalf of plaintiffs. Even though the question presented in this case has been addressed by nine of the federal circuit courts of appeals, the United States failed to file amicus curiae briefs in any of the cases and permitted those courts to proceed upon a fundamental assumption that it now characterizes as mistaken.
According to the EPA, the courts that have reached the conclusion that FIFRA preempts state failure-to-warn claims have done so under the mistaken impression that FIFRA regulates all aspects of pesticide labeling. In fact, with congressional approval, the EPA concerns itself only with whether a pesticide would have unreasonably adverse effects on human health or the natural environment. In initially registering a pesticide, the EPA does not address the question whether it will control the target pest or harm the crop it was intended to protect—the claim made here. Those are questions of pesticide efficacy. Congress gave the EPA authority to waive the review of pesticide efficacy claims, and the EPA has exercised this authority, leaving it to the marketplace and the prospect of tort liability to fill the gap. Therefore, the maintenance of state failure-to-warn claims, the United States argues, is entirely consistent with FIFRA as it is actually administered by the EPA.
The factual support for the foregoing characterization of the pesticide registration and label approval process, the United States submits, is supplied by a document issued by the EPA’s Office of Pesticides Programs, Pesticide Regulation (PR) Notice 96-4 (June 3, 1996). Notice will be taken of PR Notice 96-4 as an “official act” of the federal government within the *331 meaning of Evidence Code section 452, subdivision (c). (See Empire Properties v. County of Los Angeles (1996) 44 Cal.App.4th 781, 788, fn. 2 [52 Cal.Rptr.2d 69] [notice taken of report of task force commissioned by the Legislature]; San Mateo County Coastal Landowners' Assn. v. County of San Mateo (1995) 38 Cal.App.4th 523, 552-553 [45 Cal.Rptr.2d 117] [trial court properly took notice of letter from the Secretary of Resources to the Executive Director of the California Coastal Commission]; People v. Goodloe (1995) 37 Cal.App.4th 485, 493-494 [44 Cal.Rptr.2d 15] [notice taken of Department of Corrections’ administrative bulletin].)
The gravamen of PR Notice 96-4 is that the courts reaching the conclusion that FIERA preempts state law failure-to-warn claims have done so under the mistaken impression that the EPA evaluates efficacy in the initial pesticide registration and label approval process. However, plaintiffs do not claim the pesticides they used were inefficacious, i.e., that they failed to control the target pests. Rather, they claim they should have been warned that the combined use of these pesticides could be phytotoxic, i.e., that they might damage the crop they were intended to protect. (“This warning, that Morestan when combined with [Guthion] produces some phytotoxicity is totally missing from the label restrictions.”) As defendants point out, the EPA’s testing guidelines appear to make it clear that phytotoxicity and efficacy are distinct concepts and that, contrary to the implications of PR Notice 96-4 and assertions made in the briefs of plaintiffs and the United States, the former concept is not included in the latter.
The EPA’s testing guidelines for assessing a pesticide’s potential hazards to “non-target plants,” e.g., crops, define phytotoxicity as follows: “The term ‘phytotoxicity’ or ‘plant toxicity’ means unwanted detrimental deviations from the normal pattern of appearance, growth, and function of plants in response to pesticides and to other toxic chemicals that may be applied with the pesticide.” (EPA, Pesticide Assessment Guidelines, subd. J, Hazard Evaluation: Non-Target Plants (Oct. 1982) § 120-2, p. 18.)
A separate set of guidelines for assessing a pesticide product’s performance states that “[t]he term ‘effectiveness’ ... is synonymous with the term ‘efficacy,’ ” and defines “ ‘effectiveness’ ” as follows: “The term ‘effectiveness’ refers to a product’s ability to control the specific target pest . . . when the product is applied in accordance with the label directions, precautions, and limitations of use.” (EPA, Pesticide Assessment Guidelines, subd. G, Product Performance (Nov. 1982) § 90-2(b), p. 36.)
The claim made in PR Notice 96-4—that the EPA does not concern itself with questions of efficacy in the initial pesticide registration and label *332 approval process—is thus beside the point. Phytotoxicity is not a matter of efficacy, and it is phytotoxicity of which plaintiffs complain. Nevertheless, we will proceed to consider the argument the United States makes on the basis of PR Notice 96-4, which may be summarized as follows: The 1972 amendments to FIFRA required the EPA to evaluate all claims of pesticide efficacy. (§ 136a(c)(5).) However, as the House Agriculture Committee observed, the pesticide approval process then ground to “a virtual halt.” (H.R.Rep. No. 95-663, 1st Sess., p. 18 (1977) reprinted in 1978 U.S. Code Cong. & Admin. News, p. 1991.) In an effort to streamline the process, Congress amended FIFRA in 1978 to permit the EPA to waive review of pesticide efficacy claims. (7 U.S.C. 136a(c)(5).) The EPA issued such a waiver (40 C.F.R. §§ 158.640(b), 158.540 (1999)), explaining that it would enable the agency to focus on its “primary mandate under FIFRA ... the health and safety aspects of pesticides” (47 Fed.Reg. 53192, 53196 (Nov. 24, 1982)). Because the EPA does not review efficacy claims, the United States asserts, “preemption of state damages actions challenging pesticide efficacy would leave such statements largely, or entirely, unregulated.”
Again, the short answer to this argument is that the EPA’s waiver of the submission of efficacy data is irrelevant, since plaintiffs complain of phytotoxicity, not inefficacy. However, even assuming arguendo that phytotoxicity is included within the concept of efficacy, there remain two fundamental flaws in the argument that pesticide efficacy will go “largely, or entirely, unregulated” if state law failure-to-warn claims are preempted: (1) Although the EPA has waived the submission of efficacy data for agricultural pesticides at the time of their initial registration, the agency does require and review such data if efficacy-related problems develop later; and (2) California has a comprehensive registration and regulatory program for pesticides, and while the California Department of Pesticide Regulation may not impose its own requirements for labeling, it can restrict or prohibit the sale or use of products that it determines are inefficacious or phytotoxic. (See § 136v(a).)
1. The EPA’s postregistration consideration of efficacy
' Before granting registration, the EPA is required by FIFRA to determine whether a pesticide “will perform its intended function without unreasonable adverse effects on the environment” (§ 136a(c)(5)(C)), which means “any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use” of the pesticide (§ 136(bb)). The term “environment” is defined to include “all plants” (§ 136(j)), and this definition includes crops (see Kuiper v. American Cynamid Co., supra, 131 F.3d at p. 664).
The 1978 amendment to FIFRA allows the EPA, “[i]n considering an application for the registration of a pesticide [to] waive data requirements *333 pertaining to efficacy.” (§ 136a(c)(5).) However, in promulgating the waiver, the EPA emphasized that in the event that efficacy-related problems developed after a pesticide was registered, the agency would require and review such data. “The Administrator reserves the right to request submission of efficacy data in support of label claims for any registered product. A request may be made for any product for which a pattern of inadequate performance has been reported.” (44 Fed.Reg. 27932, 27939 (May 11, 1979); see 40 C.F.R. § 158.640(b) [EPA “reserves the right to require, on a case-by-case basis, submission of efficacy data for any pesticide product registered or proposed for registration”].) Along the same lines, the EPA subsequently explained that without “initial product performance data, the Agency is compelled to monitor more closely the content of use directions on labels. ... If a pattern of inaccurate, outdated, or ambiguous use directions is determined to be a major problem, the Agency will require the submission of efficacy data.” (49 Fed.Reg. 37960-37961 (Sept. 26, 1984).)
The EPA’s recent adverse effects reporting rule (§ 136d(a)(2)) requires pesticide manufacturers to submit “toxic or adverse effect incident reports,” specificálly including data concerning “alleged effect[s] involving] damage to plants.” (40 C.F.R. § 159.184(c)(5)(iv)(1999).) Significantly, the regulation provides that information need not be reported for an “incident” which “concerns non-lethal phytotoxicity to the treated crop if the label provides an adequate notice of such a risk.” (40 C.F.R. § 159.184(b)(4), italics added.) Moreover, upon receiving crop damage reports under the adverse effects reporting rule, the agency’s regulatory options are not limited to cancellation; it can also require labeling changes. The EPA explained when it promulgated the rule that, “[w]hile reportable information under section 6(a)(2) could conceivably result in cancellation . . . action, this information could also be used by the Agency in other ways. The information could suggest the need for modification to the terms and conditions of registration which could be necessitated by the balancing of the risks and benefits associated with a particular pesticide.” (42 Fed.Reg. 49370, 49372 (Sept. 19, 1997).)
2. California’s regulatory program
Congress, the United States asserts, did not intend to leave pesticide efficacy unregulated. “On the contrary, Congress specifically sanctioned state regulation of pesticide efficacy.”
FIFRA clearly does contemplate a state/federal partnership in the regulation of pesticide efficacy and phytotoxicity. Section 136v(a) provides that a “State may regulate the sale or use of any federally registered pesticide or *334 device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.” This does not mean, however, that the regulation may be accomplished through the back door by means of tort suits that effectively require changes in EPA-approved labeling.
California requires that pesticide manufacturers and their products be registered with the Department of Pesticide Regulation. (Food & Agr. Code, §§ 12811, 12993.) The code requires that a comprehensive risk/benefit analysis be undertaken in the public interest when the department considers whether a product should be registered in the first instance or whether its registration should be canceled. (Food & Agr. Code, §§ 12824, 12825; see also Cal. Code Regs., tit. 3, § 6158.) With regard to the specific claim made in this case, the department may require data on “[p]hytotoxicity” and “[t]he effect from the use of . . . two or more products, in combination.” (Cal. Code Regs., tit. 3, § 6192, subds. (b), (e).) To ensure that California’s agriculture is protected from unforeseen or newly discovered risks, the director is charged with the responsibility for the “continuous evaluation of all registered products.” (Cal. Code Regs., tit. 3, § 6226.) As part of this continuous evaluation, the director must make administrative determinations regarding precisely the issue raised by this case—“[u]ndesirable phytotoxicity.” (Cal. Code Regs., tit. 3, § 6221, subd. (f).)
Given the comprehensive and stringent character of California’s program of pesticide regulation, having lay juries assess questions of phytotoxicity in the context of failure-to-warn claims is neither necessary nor desirable, and holding that such actions are preempted by FIFRA promotes federalism, rather than undermines it.
E. Determining Whether Particular Causes of Action Are Preempted Under FIFRA
Having concluded that FIFRA preempts state law claims for failure to warn of the risks of using a pesticide, we now turn to the question whether plaintiffs’ claims can fairly be so characterized. (See Cipollone, supra, 505 U.S. at p. 523 [112 S.Ct. at p. 2621] [“we must look to each of petitioner’s common-law claims to determine whether it is in fact pre-empted” (fn. omitted)].)
In determining whether specific claims are preempted by the 1969 Cigarette Act, “[t]he central inquiry in each case,” the high court said, is “straightforward.” (Cipollone, supra, 505 U.S. at pp. 523-524 [112 S.Ct. at p. 2621].) “[W]e ask whether the legal duty that is the predicate of the *335 common-law damages action constitutes a ‘requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising or promotion,’ giving that clause a fair but narrow reading.” (Id. at p. 524 [112 S.Ct. at p. 2621].)
“In this case,” Cipollone continued, “petitioner offered two closely related theories concerning the failure to warn: first, that respondents ‘were negligent in the manner [that] they tested, researched, sold, promoted, and advertised’ their cigarettes; and second, that respondents failed to provide ‘adequate warnings of the health consequences of cigarette smoking.’ [¶] Petitioner’s claims are pre-empted to the extent that they rely on a state-law ‘requirement or prohibition . . . with respect to . . . advertising or promotion.’ Thus, insofar as claims under either failure-to-warn theory require a showing that respondents’ post-1969 advertising or promotions should have included additional, or more clearly stated, warnings, those claims are pre-empted. The Act does not, however, pre-empt petitioner’s claims that rely solely on respondents’ testing or research practices or other actions unrelated to advertising or promotion.” (Cipollone, supra, 505 U.S. at pp. 524-525 [112 S.Ct. at pp. 2621-2622].) The court went on to consider petitioner’s other causes of action, summarizing its holding as follows: “[T]he 1969 Act pre-empts petitioner’s claims based on a failure to warn and the neutralization of federally mandated warnings to the extent that those claims rely on omissions or inclusions in respondents’ advertising or promotions; the 1969 Act does not pre-empt petitioner’s claims based on express warranty, intentional fraud and misrepresentation, or conspiracy.” (Id. at pp. 530-531 [112 S.Ct. at p. 2625].)
In determining whether particular causes of action are preempted under FIFRA, “[w]e can do no better than to adapt the United States Supreme Court’s approach in Cipollone: the central inquiry in each case is whether the legal duty that is the predicate of the common law damages action constitutes a State ‘requirement[] for labeling or packaging in addition to or different from’ the FIFRA requirements, giving that clause a fair but narrow reading. 7 U.S.C. § 136v(b); Cipollone, at [524], 112 S.Ct. at 2621.” (Hue v. Farmboy Spray Co., Inc. (1995) 127 Wash.2d 67, 85-86 [896 P.2d 682, 692].)
When a claim, however couched, boils down to an assertion that a pesticide’s label failed to warn of the damage plaintiff allegedly suffered, the claim is preempted by FIFRA. (See Andrus v. AgrEvo USA Co. (1999) 178 F.3d 395 [implied warranty]; Kuiper v. American Cyanamid Co., supra, 131 F.3d 656, 666 [negligent off-label misrepresentations]; Grenier v. Vermont Log Bldgs., Inc., supra, 96 F.3d at pp. 563-565 [negligence, express and implied warranty, and negligent design and manufacture]; Welchert v. Amercian Cyanamid, Inc (8th Cir. 1995) 59 F.3d 69, 72-73 [express warranty]; *336 Taylor AG Industries v. Pure-Gro, supra, 54 F.3d at p. 562 [negligent testing]; Papas v. Upjohn Co., supra, 985 F.2d at p. 518 [negligence, strict liability, and implied warranty].)
On the other hand, courts have rejected preemption challenges with regard to a wide variety of claims where they did not implicate requirements for labeling or packaging different from those required by FIFRA. (See Burt v. Fumigation Service and Supply, Inc. (W.D.Mich. 1996) 926 F.Supp. 624, 631 [negligent design]; Reutzel v. Spartan Chemical Co. (N.D. Iowa 1995) 903 F.Supp. 1272, 1281-1282 [strict liability for defective design and manufacture] ; Arkansas-Platte & Gulf Partnership v. Dow Chemical Co. (D.Colo. 1995) 886 F.Supp. 762, 767-768 [strict liability for defective design and manufacture and negligent design and manufacture]; Higgins v. Monsanto Co. (N.D.N.Y. 1994) 862 F.Supp. 751, 757-761 [negligent testing, strict liability for defective design, and express warranty]; Jillson v. Vermont Log Bldgs., Inc. (D.Mass. 1994) 857 F.Supp. 985, 990-992 [express warranty and negligent design and manufacture]; Bingham v. Terminix Intern. Co., L.P. (S.D.Miss. 1994) 850 F.Supp. 516, 521-522 [negligent testing and inspection, strict liability, and implied warranty]; Ackerman v. American Cyanamid Co., supra, 586 N.W.2d at pp. 214-215 [negligent design and testing]; McAlpine v. Rhone-Poulenc Ag. Co. (1997) 285 Mont. 224 [947 P.2d 474, 478-479] [express warranty, implied warranty, and strict liability for defective design and manufacture].)
We turn now to the causes of action tendered by the plaintiffs in this case. In their first cause of action, plaintiffs alleged that defendant Bayer negligently manufactured, formulated, produced, packaged and tested Morestan and Guthion. They also alleged that defendants Tri-Ag and its employee Osterlie negligently recommended the application of Morestan together with Guthion at certain concentrations and with certain other products. Their other causes of action, in the order recited in the complaint, were: strict liability for ultrahazardous activity, negligence per se for violating certain sections of the Food and Agriculture Code, product liability, breach of implied warranty, misrepresentation, and trespass.
As previously stated, defendants moved for summary judgment on the ground that all of plaintiffs’ causes of action, in effect, challenged the adequacy of the warnings on Guthion’s and Morestan’s EPA-approved labels, and thus were preempted by FIFRA. In two summary judgment rulings, the trial court agreed, holding that all of the causes of action did “allege inadequate labeling in one form or another,” with the “main issue being the failure of the labels to warn against mixing chemicals.” In addition, the court held that plaintiffs failed to produce evidence indicating a *337 cause of action for negligence against defendants Tri-Ag and Osterlie, and, as to the cause of action for misrepresentation, failed to raise a triable issue of fact as to intent to defraud on the part of defendants.
Because the Court of Appeal held that state law failure-to-warn claims are not preempted by FIFRA, it did not discuss “the other points raised by the parties,” in particular, defendants’ contention that all of plaintiffs’ causes of action were predicated upon alleged inadequacies in Guthion’s and Morestan’s EPA-approved labels. We remand that it may do so.
For the guidance of the Court of Appeal on remand, we address one final issue—the extent to which FIFRA preempts actions based on so-called off-label statements, that is, statements made outside of the context of labeling or packaging; for example, claims made orally or in advertising materials. The critical question is whether the off-label statements “merely repeat information in the label itself.” (Kuiper v. American Cyanamid Co., supra, 131 F.3d at p. 662.) Where off-label statements address matters outside the scope of the label, an action may well lie.
Disposition
The judgment of the Court of Appeal is reversed and the matter remanded for further proceedings consistent with this opinion.[3]
George, C. J., Baxter, J., and Chin, J., concurred.

All statutory references are to title 7 of the United States Code unless otherwise indicated.

“Only four Justices joined in the portion of the opinion [holding] the Public Health Cigarette Smoking Act of 1969 preempted claims based upon state failure-to-warn claims. However, in his opinion concurring in part and dissenting in part, Justice Scalia, joined by Justice Thomas, stated that he agreed with the following language of the plurality opinion; ‘that the language of the . . . Act plainly reaches beyond [positive] enactments; that the general tort-law duties petitioner invokes against the cigarette companies can, as a general matter, impose “requirements or prohibitions” within the meaning of [§ 1334(b)]; and that the phrase “state law” as used in [§ 1334(b)] embraces State common law. . . .’ Cipollone v. Liggett Group, Inc., . . .112 S.Ct. at 2634 (citations and internal quotations omitted). Thus, the holding of the plurality opinion that the language of § 1334(b) preempted the plaintiff’s failure-to-warn claim can fairly be said to constitute the view of the Court because six members of the Court concurred in that conclusion. See King v. E.I. Du Pont De Nemours & Co., 996 F.2d 1346, 1349 (1st Cir.), cert, dismissed, 114 S.Ct. 490, 126 L.Ed.2d 440 (1993); Shaw v. Dow Brands, Inc., 994 F.2d 364, 370 n. 4 (7th Cir. 1993).” (MacDonald v. Monsanto Co., supra, 27 F.3d at p. 1024, fn. 1.)

The concurring and dissenting opinion sets up a “Catch 22” by imposing a burden defendants cannot reasonably be expected to carry. In order to establish preemption, defendants would have to show that “the EPA, after full consideration of information relevant to the allegation that combined use of its products causes crop damage, has determined that no change in the products’ labels is required.” (See cone, and dis. opn. of Kennard, J., post, at p. 340.) The EPA would be unlikely ever to make such a determination. If few reports of crop damage were brought to the EPA’s attention, or if the state law failure-to-warn actions claiming such damage were unsuccessful, the agency would have no reason to expend the resources required to reassess the adequacy of a label. On the other hand, if a substantial number of successful failure-to-warn actions claiming crop damage were brought to the EPA’s attention, the agency would hardly be likely to affirm the label. And even if a substantial number of unsuccessful state law failure-to-warn suits claiming crop damage were to prompt the EPA to reconsider and reaffirm a product’s label, the ability of a defendant to assert preemption would depend upon whether a particular suit were brought before or after the critical mass had been reached. In short, the rule proposed in the concurring and dissenting opinion would be as destructive to the ideal of reaching like results in like cases as it would be to Congress’s goal of ensuring uniformity in pesticide labeling by preempting state law failure-to-warn claims.