881 So.2d 1 (2004)
E.I. DU PONT DE NEMOURS AND COMPANY, Appellant,
v.
AQUAMAR S.A., Emelorsa-Empacadora El Oro S.A. and Industrial y Agricola 44 S.A., Appellees.
No. 4D01-1642.
District Court of Appeal of Florida, Fourth District.
March 31, 2004.
Rehearing Denied August 30, 2004.
*2 Jane Kreusler-Walsh and Rebecca Mercier-Vargas of Jane Kreusler-Walsh, P.A., West Palm Beach, Daniel F. Molony of Shook, Hardy & Bacon, L.L.P., Tampa, and Thomas M. Sherouse of Shook, Hardy & Bacon, L.L.P., Miami, for appellant.
Bruce Rogow, Beverly A. Pohl and Cheryl Zickler of Bruce S. Rogow, P.A., and Walter G. Campbell, Jr., Robert J. McKee and Ivan Cabrera of Krupnick, Campbell, Malone, Roselli, Buser, Slama, Hancock & McKee, Fort Lauderdale, for appellee Aquamar S.A.
STEVENSON, J.
The appellant, E.I. Du Pont de Nemours and Company ("Du Pont"), manufactures Benlate, a fungicide. Starting in the late 1980's/early 1990's, Benlate was applied to banana farms in Ecuador to prevent the spread of a disease called Black Sigatoka. After nearby shrimp farms, including Aquamar, S.A.,[1] whose water source is the local rivers, began to experience massive shrimp mortalities, they filed suit against Du Pont. A jury found that Du Pont was negligent in its distribution of Benlate, awarding damages in excess of $12 million dollars. Du Pont appeals, asserting that Aquamar's tort claims are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act, that the trial court made a number of erroneous evidentiary rulings, and that the $12 million verdict includes improper elements of damages. We find merit in Du Pont's preemption argument and reverse.

The Causation & Negligence Theories
In the late 1980's/early 1990's, Black Sigatoka, a disease that affects banana crops, spread to Ecuador. To combat the disease, banana farmers rotated three fungicides: Benlate, manufactured by Du Pont; Tilt, manufactured by Ciba-Geigy; and Calixin, manufactured by BASF. The rotation of the fungicides was designed to prevent the disease from becoming resistant to the chemicals and was recommended by the Fungicide Resistance Action Committee ("FRAC"). Representatives of Du Pont were members of FRAC.
At trial, Aquamar took the position that Benlate is the cause of a disease known as Taura Syndrome and that Taura Syndrome either directly caused the shrimp deaths or exposure to benomyl, the active ingredient in Benlate, had so weakened the shrimp's immune system that they were susceptible to the disease. When benomyl comes into contact with water, it breaks down into a compound known as MBC or carbedazim. MBC was found in the dead shrimp. For its part, Du Pont acknowledged that Benlate is toxic to shrimp and that it never tested the effects of benomyl on Pacific White Shrimp, the variety farmed at Aquamar. Du Pont contended, however, that Benlate was not responsible for the shrimp deaths and that Aquamar could not link the MBC found in Aquamar's shrimp to Benlate. Du Pont maintained that other fungicides used in the area, including a chemical known as thiophanate methyl, also broke down into *3 MBC. Ultimately, Du Pont argued that the cause of the shrimp deaths was not a toxin at all, but, rather, a new virus  the Taura Syndrome Virus. Both sides called a litany of experts.
On the issue of Du Pont's negligence, Aquamar pursued three separate theories. First, Aquamar argued that Du Pont had been negligent in failing to adequately test Benlate, eliciting testimony from Du Pont employees that the company never tested the effects of the product on Pacific White Shrimp, had done only limited testing regarding the product's run-off potential, and had performed no testing specific to Ecuador. In a somewhat similar vein, Aquamar also suggested that Du Pont had been negligent in failing to warn the banana farmers of the run-off potential and the product's toxicity to shrimp as the label applied to Benlate exported to Ecuador indicated that the product was toxic to fish, but made no mention of shrimp.
Last, but not least, Aquamar asserted that Du Pont had been negligent in its distribution of Benlate. The last of these theories was not as clearly defined at trial as the others. Based upon counsel's closing argument, however, it appears the theories underlying the claim were two-fold. First, counsel pointed to Du Pont's failure to warn of or help solve run-off problems in the face of FRAC's recommendation regarding product rotation and Du Pont's knowledge that the product was being aerially applied. On appeal, Aquamar further fleshes out this argument by asserting that Du Pont was negligent in "advising and instructing Ecuadorians that Benlate should be widely applied in combination with the fungicides Tilt and Calixin...." Second, counsel pointed to Du Pont's actions or the lack thereof after it was notified by the Ecuadoran government, in September 1993, of the shrimp deaths and the suspected link to fungicide. The jury resolved only the negligent distribution theory in favor of the plaintiffs. Against this backdrop, we now turn to Du Pont's first point on appeal, wherein it argues that the jury verdict cannot stand because Aquamar's claims were preempted by the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C.A. §§ 136-136y.

Does the Federal Insecticide, Fungicide, and Rodenticide Act preempt Aquamar's state law claim for negligent distribution?
The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C.A. §§ 136-136y (1999), provides a comprehensive scheme for pesticide labeling and generally makes it unlawful for any United States manufacturer to sell an unregistered pesticide, stating that "no person in any State may distribute or sell to any person any pesticide that is not registered under this subchapter."[2]See § 136a(a). Registration is an involved process culminated by the EPA Administrator's approval of the product's label and determination that other FIFRA requirements have been satisfied. See § 136a(c)(5)(B). The manufacturer must file information including the proposed label, the purpose of the pesticide and "any directions for its use" and, if requested, test descriptions and results. See 7 U.S.C.A. § 136a(c)(1)(C)-(F); 40 C.F.R. § 156.10 (2003). The EPA reviews the filing and the label, and determines whether the label information is adequate to protect the public from misleading claims *4 or "unreasonable adverse" environmental effects. See 7 U.S.C.A. § 136a(c)(5).
Despite the prohibition against the sale of unregistered pesticides in the United States, pesticides that are intended solely for export need not be "registered." Pursuant to § 136o, a manufacturer in the United States may sell or distribute an unregistered pesticide to a foreign country provided it complies with specified labeling requirements and provides a statement to the foreign country indicating that the product is not registered for use in the United States. 7 U.S.C.A. § 136o(a); 40 C.F.R. § 168.65. A violation of any of FIFRA's requirements subjects the manufacturer to civil penalties imposed by the EPA and to possible criminal penalties. § 136l.
In the face of such comprehensive sale and labeling regulation, Congress included an express preemption clause in FIFRA,[3] prohibiting any "State" from "impos[ing] or continu[ing] in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." § 136v(b). This language has been interpreted as prohibiting "any state common law cause of action that rests on an alleged failure to warn or convey information about a product through its label." See In re DuPont-Benlate Litig., 859 F.Supp. 619, 622 (D.P.R.1994); ISK Biotech Corp. v. Douberly, 640 So.2d 85, 88 (Fla. 1st DCA 1994)(holding that "FIFRA preempts all state common law actions that are associated in any way with a claim of inadequate labeling"); see also Lowe's Home Ctrs., Inc. v. Olin Corp., 313 F.3d 1307, 1310 (11th Cir.2002).
Here, the trial court concluded that FIFRA and its preemption provision were inapplicable because the plaintiff's claims arose from use of the pesticide in Ecuador. This was error. Although producers of pesticides intended for export are exempted from FIFRA's registration requirements with the EPA, exported pesticides must nevertheless be labeled accurately and include certain information. See § 136o(a)(1)-(2). Significantly, FIFRA mandates that a pesticide intended for export may not be "misbranded." See §§ 136(p)-(q). A pesticide intended for export is misbranded if, among other requirements:
(G) the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment;
7 U.S.C.A. § 136(q)(1)(G)(emphasis added).
In addition, pesticides intended for export are subject to section 136(q)(2), which provisions indicate that a pesticide may be "misbranded" based upon the label's failure to include certain information, such as an ingredient statement, use classification, producers information, "poison" and skull and crossbones for highly toxic substances, and a first aid statement. The foregoing requirements adequately demonstrate Congress's intent to regulate the "labeling" of dangerous pesticides produced in the United States, but exported to foreign markets.
*5 Aquamar argues that the requirements of FIFRA were not intended to bar foreign plaintiffs from asserting claims against United States corporations in state courts for damages caused by the use of pesticides abroad. We agree, of course, that Ecuador is not a "State" and FIFRA's preemption provision could not be read to prohibit the country of Ecuador from imposing additional labeling or warning requirements upon pesticide manufacturers. And, under appropriate jurisdictional circumstances, a foreign plaintiff, relying on foreign law, could probably assert an inadequate warning or "labeling" claim in a state court based on injury arising from the use of a United States-manufactured pesticide abroad. In this case, however, the plaintiff elected to proceed in the State of Florida and under Florida law. Consequently, whether the pesticide at issue was registered for use in the United States and then exported, or simply exported without registration for use in the United States, FIFRA governs the product's label and prohibits the State of Florida from imposing any additional or different requirements.
Indeed, as the court noted in Mortellite v. Novartis Crop Protection, Inc., 278 F.Supp.2d 390, 397 (D.N.J.2003)(quoting Wisconsin Public Intervenor v. Mortier, 501 U.S. 597, 601, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991)): "[C]ourts have recognized that FIFRA is more than `a labeling law,' but is `a comprehensive regulatory statute.'" Whether the product was registered in the United States and then exported or simply exported without registration for use in the United States, Du Point was obligated to comply with a host of labeling and administrative requirements imposed by FIFRA relating to the safety of the product and the adequacy of any necessary warnings. Thus, the question of whether the product's label contained adequate and necessary warnings was a matter for administrative determination within the context of federal regulations, not Florida common law.
In Papas v. Upjohn Co., 985 F.2d 516, 518 (11th Cir.1993)(quoting Cipollone v. Liggett Group, Inc., 505 U.S. 504, 521, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)), the court read FIFRA's preemption provision in section 136v(b) to "`suggest[ ] no distinction between positive enactments and the common law.'" The court explained that common law actions constituted an "additional" requirement within the meaning of § 136v(b) where damage awards are a form of state regulation. Thus, the court held that "[t]o the extent that state law actions for damages depend upon a showing that a pesticide manufacturer's `labeling or packaging' failed to meet a standard `in addition to or different from' FIFRA requirements, section 136v pre-empts the claims." Id. (quoting language from § 136v(b)).
The question, then, becomes whether Aquamar's negligent distribution claim, the only claim upon which it prevailed at trial, is truly nothing more than a disguised labeling claim, as argued by Du Pont. "When a claim, however couched, boils down to an assertion that a pesticide's label failed to warn of the damage plaintiff allegedly suffered, the claim is preempted by FIFRA." Etcheverry v. Tri-Ag Serv., Inc., 22 Cal.4th 316, 93 Cal.Rptr.2d 36, 48, 993 P.2d 366 (2000).
Where it is not clear whether a claim is preempted, the determination of whether a claim is permissible or preempted depends on "whether one could reasonably foresee that the manufacturer, in seeking to avoid liability for the error, would choose to alter the product or the label."
Arnold v. Dow Chem. Co., 91 Cal.App.4th 698, 110 Cal.Rptr.2d 722, 736 (2001)(quoting *6 Worm v. Am. Cyanamid Co., 5 F.3d 744, 747-48 (4th Cir.1993)); see also Dow Agrosciences LLC v. Bates, 332 F.3d 323, 331 (5th Cir.2003)(holding that farmer's claims were preempted by § 136v(b) "if a judgment against Dow would induce it to alter its product label"), petition for cert. filed, No. 03-388, 72 U.S.L.W. 3184 (U.S. Sept. 9, 2003).
In Schuver v. E.I. Du Pont de Nemours & Co., 546 N.W.2d 610 (Iowa 1996), the Iowa Supreme Court addressed negligence claims remarkably similar to those asserted by Aquamar and concluded that they were preempted by FIFRA. There, an O'Brien County farmer, Raymond Schuver, applied Preview, an herbicide manufactured by Du Pont, to his soybean crop in 1988, 1989, and 1990. Schuver rotated his crop land between soybeans and corn and, in 1989, began to notice problems with his corn crop. An agronomist with the retailer who sold the Preview to Schuver attributed the damage to "residual carryover effect," i.e., the length of time that an application of pesticide might harm subsequently planted crops. Id. at 611. Schuver sued the retailer and Du Pont, alleging negligence in manufacturing and sale of the product to Schuver (count I); strict liability in that the product was defective and unreasonably dangerous (count II); and breach of an implied warranty of merchantability (count III). In count IV, Schuver alleged that the retailer made and breached an express warranty that Preview was the appropriate product for use on the Schuver farm. See id. at 611-12. With respect to the claims against Du Pont, the district court found that they were preempted by FIFRA. Schuver appealed.
On appeal, Schuver conceded that the implied warranty claims were preempted, but steadfastly argued that the negligence and strict liability claims were not preempted because they were not labeling claims. According to Schuver's counsel, Du Pont's negligence was not in any shortcoming of the label, but rather in (1) marketing Preview in O'Brien County when Du Pont either knew or should have known that soil in O'Brien County was susceptible to residual carryover; (2) failing to withdraw Preview from sale in O'Brien County after learning of crop damage caused by Preview in that county; (3) failing to test Preview in O'Brien County soil types before selling the product in O'Brien County; and (4) failing to timely notify O'Brien County farmers of Preview's propensity for residual carryover. See 546 N.W.2d at 613. The Iowa Supreme Court concluded that all of this was "merely another way of arguing that Du Pont's labels should have warned against using Preview in O'Brien County" and, thus, the district court had correctly concluded that the claims were preempted by FIFRA. Id. at 614; see also Hue v. Farmboy Spray Co., 127 Wash.2d 67, 896 P.2d 682 (1995)(en banc).
By substituting "Ecuador" for "O'Brien County," "Benlate" for "Preview," and "run-off potential" for "residual carryover," the similarity between Schuver and the instant case is apparent. Moreover, it is clear that, to avoid liability for Aquamar's claimed negligence, the remedy is for Du Pont to specifically warn of run-off potential and toxicity to shrimp. Consequently, we find that Aquamar's negligent distribution claim is, at its heart, a claim challenging the product's label and the failure to warn. As such, FIFRA preempts the state law claim.
Lastly, we reject Aquamar's argument that this case amounts to more than a failure to warn claim since Du Pont, through its role in the Fungicide Resistance Action Committee (FRAC), allegedly specifically advised that the banana farmers *7 needed to rotate the fungicides to avoid fungicide resistance. In our view, Aquamar's claim in this regard is akin to an assertion that a manufacturer's point-of-sale advertisement or information material was inadequate to warn of the dangers of a product. In Papas, the Eleventh Circuit stated:
[A]ny claims that point-of-sale signs, consumer notices, or other informational materials failed adequately to warn the plaintiff necessarily challenge the adequacy of the warnings provided on the product's labeling or packaging. If a pesticide manufacturer places EPA-approved warnings on the label and packaging of its product, its duty to warn is satisfied, and the adequate warning issue ends.[[4]]
985 F.2d at 519. Additionally, Aquamar did not plead a cause of action for negligent misrepresentation or fraud with regard to these "off-label" statements.
In conclusion, our decision renders the additional issues raised on appeal by Du Pont moot. Accordingly, we reverse the jury verdict and remand for entry of judgment in favor of the defendant below, Du Pont.
REVERSED and REMANDED.
MAY, J., and CHAVIES, MICHAEL B., Associate Judge, concur.
NOTES
[1] Initially, two other shrimp farms, Emelorsa-Empacadora el oro S.A. and Industrial Y Agricola 44 S.A., were also plaintiffs. Sometime in 1997, however, Aquamar bought out these farms.
[2] A "person" is "any individual, partnership, association, corporation, or any organized group of persons whether incorporated or not." 7 U.S.C.A. § 136(s). A "State" means "a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Trust Territory of the Pacific Islands, and American Samoa." § 136(aa).
[3] It is well-established that our Constitution's Supremacy Clause gives Congress the power to preempt state law. Preemption can occur in three ways: (1) the federal statute contains express language of preemption, so-called express preemption; (2) the scheme of federal regulation is so pervasive that there is no room for state regulation, known as field preemption; and (3) compliance with federal and state law is impossible, conflict preemption. See Blinn v. Fla. Dep't of Transp., 781 So.2d 1103, 1109 (Fla. 1st DCA 2000).
[4] Compare Lowe v. Sporicidin, Int'l, 47 F.3d 124, 130 (4th Cir.1995)(suggesting that claims against manufacturers for advertisements that "substantially differ" from the label may be actionable).